Richard S. Heller, J.
This claim has been submitted to the court on an agreed statement of facts. The claim arises out of a contract for the construction of an arterial highway in the city of Binghamton.
*805 The Department of Public Works prepared a bid proposal and specifications for the work. The construction involved the diversion of a stream through a 102-inch diameter steel pipe, part of which, known as “ multi-plate ”, was to be installed in an open cut and part of which, known as “ tunnel liner plate ”, was to be installed in a tunnel. Detailed specifications of the mechanical and physical characteristics and methods of installation of the tunnel liner plate were set forth.
The tunnel liner plate as specified was unique and had been developed by the plaintiff so that tunnels could be constructed by unskilled workmen classified as common laborers. For many years installations of tunnel liner plate by the claimant and others using the plate had been made by common laborers paid at the prevailing wage for common laborers in the areas where the work was done. This information was given to the Department of Public Works by the claimant and it was contemplated both by the claimant and the Department of Public Works that the work would be performed by common laborers to be paid at the rate of $1.87% per hour with two men having previous experience in the work, being paid at the rate of $2.15 per hour.
As required by section 220 o'f the Labor Law, the bid proposal contained a schedule of job classifications and the minimum wage to be paid to each of these classifications. The only job classification contained in that schedule applicable to the installation of tunnel liner plate was “ Laborer ” at a minimum wage of $1.71 per hour.
Prior to the award of the contract, claimant had entered into a contract with N. R. Corbisello, Inc., and Triple Cities Construction Co. whereby claimant was to perform the installation of the multi-plate and tunnel liner plate in the event that Corbisello and Triple Cities were awarded the contract and claimant was approved as a subcontractor by the State as required by the contract provisions set forth in the bid proposal. In entering into this contract claimant was aware of the schedule of minimnffl hourly rates and contemplated payments of not more than the rate to be paid by the prime contractors for laborers of $1.87% per hour with two men experienced in the installation of tunnel liner plate being paid $2.15 per hour.
On June 20,1952 the contract was awarded to K R. Corbisello, Inc., and Triple Cities Construction Co. and on July 11, 1952 claimant was approved by the State as subcontractor to perform the work of installing the multi-plate and tunnel liner plate. On September 1, 1952 claimant commenced the installation of the multi-plate in the open cut leading to the site of the proposed tunnel and this work was performed by ironworkers at *806 the rate of $2.82 per hour. The wage schedule attached to the bid proposal provided for “ Iron & Steel Worker (Structural) ” at a rate of $2.62% per hour. The wage schedule also contained a provision that labor classifications not listed could be used only with the consent of the Superintendent of Public Works and the rate to be paid was to be given by the Superintendent of Public Works after advising with the State Department of Labor.
On September 10,1952 the multi-plate installation was stopped by a jurisdictional dispute between the Ironworkers Union and the Laborers Union which was settled between the unions and the installation continued as before. On October 14, 1952 claimant commenced installation of the tunnel liner plates utilizing two men having previous experience in the work at a rate of $2.15 per hour and common laborers at $1.87% per hour. A demand was made by the union that claimant pay the so-called New York sand hog rate of $3 per hour or at least the $2.82 per hour being paid ironworkers on the multi-plate installation. Claimant refused and on October 17, 1952 a strike was called shutting down the entire project.
On the same date the Department of Public Works requested the Industrial Commissioner to furnish wage rates for positions on the project identified as “liner plate laborer (free air) ” and “ tunnel laborer (free air) ” indicating that union officials claimed the rate should be $2.14% and $1.87% per hour respectively. On the same date the Industrial Commissioner advised the Department of Public Works of prevailing hourly wage rates as
“Liner Plate Laborer (free air) $2.14%
Tunnel Laborer (free air) 2.14%
Laborer (common) 1.87 ”
and the Department of Public Works so informed the claimant. The Laborers Union continued to object to the wage rates but permitted resumption of work on the project with the exception of the tunnel, and discussions continued among claimant, the general contractor, the Department of Public Works, union officials and the State Labor Mediation Board.
On October 23, 1952 the Binghamton district engineer of the Department of Public Works wrote to the Department of Public Works at Albany:
This letter is to confirm isy telephone conversation with you in response to a request by the Depart rent of Labor that wage rates for the following proper classifications in resp > <it to tunnel work on the above identified contract be furnished to us. Position are:
*807 Liner Plate Tunnel (in free air)
1. Miner
2. Miner’s Helper
3. Mucker
4. Tunnel Laborer
5. Electrician
The tunnel work is being held up until these classifications are established and wage rates furnished.
Kindly advise as quickly as possible when rates are established so that the same can be posted on the project.
On October 24, 1952 the Department of Public Works in Albany wrote a letter to the Industrial Commissioner:
Will you please furnish us minimum hourly wage rates for Contract FAC 52-3, FASH 52-8, Proj. U-496(8), Broome Co., Prev. Rate Case No. 52-932, on the following occupations:
Miner
Miner’s Helper
Mucker
Tunnel Laborer
Electrician
This confirms our telephone conversation in which it was explained that local union oficiáis have caused a holdup of all work on this Contract until what they claim are the proper occupations and rates are used by the contractor on this work.
On October 27, 1952 the Industrial Commissioner reported to the Department of Public Works in Albany,
that the prevailing hourly wage rates for such work are as follows:
Miner $2.82
Miner’s Helper 2.14%
Mucker 2.14%
Tunnel Laborer 2.12%
Electrician 2.75
This information was transmitted to the Binghamton office of the Department of Public Works and then to representatives of the contractors and labor unions involved.
The unions continued to object to these wages but about December 8, 1952 despite the efforts of the Laborers Union to prevent work on the tunnel, claimant was able to resume the tunnel work at the rates set forth by the Industrial Commissioner on October 27, 1952. On December 5 the Teamsters Union asked the Department of Public Works to request new labor rates for the tunnel work effective as of December 5 and about December 12, 1952 the prime contractor sent a telegram to the Department of Public Works in Albany requesting official rates for tunnel work effective December 5, 1952 and on Decern *808 her 15, 1952 this request was forwarded by the Department of Public Works to the Industrial Commissioner. On December 29, 1952 the Industrial Commissioner wrote to the Department of Public Works setting forth occupations and rates as follows:
Miner Liner Plate Tunnel $2.82
Miners Helper Liner Plate Tunnel 2.62%
Mucker Liner Plate Tunnel 2.62%
Tunnel Laborer Liner Plate Tunnel 2.62%
Electrician Liner Plate Tunnel 3.25
and specifically stating that these classifications and minimum wage rates superseded those established by the Industrial Commissioner and contained in the bid proposal and requiring that the new schedule form a part of the specifications for the work prior to the advertisement for bids and pointing’ out the penalties for failure to comply.
Claimant immediately objected to these rates and at its request various hearings were held before the Industrial Commissioner who made various determinations, all of which in effect promulgated the same classifications and wage schedules as determined by the Industrial Commissioner on December 29, 1952. Claimant thereupon commenced an article 78 proceeding to review the determination and refused to pay any wages higher than those set forth by the Industrial Commissioner on October 27, 1952. This article 78 proceeding resulted in the annulment of the determination and the remission of the matter to the Industrial Commissioner. (Matter of Armco Drainage & Metal Products v. Moore, 285 App. Div. 236.) Meanwhile the claimant completed the work at the wage rates established on October 27, 1952, and following completion on June 6, 1953, the work was accepted by the State. Approximately $10,000 due the prime contractor had been withheld by the State to cover any increased wages due if the determination of the Industrial Commissioner made on December 29, 1952 was upheld, and the prime contractor assigned its rights, if any, to said sum to the claimant. On December 2, 1955 the Industrial Commissioner made a final order setting forth the classifications and minimum rates for the installation of the tunnel liner plate on this project as,
Miner $2.82
Miner’s Helper 1.80
Mucker 1.80
Mucker Tunnel Laborer 1.80
Electrician (tunnel) 3.25
*809 Claimant contends that these facts establish a breach of contract by the State entitling it to recover all or some portion of the amount paid for labor in excess of what it would have paid under the rates originally contemplated. The State contends that the claimant is not entitled to recover, contending that there is no privity between the State and the claimant, that the contract contemplated changes in the minimum wage to be paid, and that the State never required the payment of higher rates but such payments were voluntary and made solely as the result of a labor dispute and in order to complete the work.
There is a controversy between the parties as to whether or not the previous decision by Judge Sylvester of this court in which the original claim was dismissed with leave to file an amended claim, established the law of the case concerning the question of privity. (Armco Drainage & Metal Products v. State of New York, 1 Misc 2d 94.) That particular controversy we find unnecessary to determine since, whether law of the case or dictum, we are in full agreement with Judge Sylvester’s conclusion.
The bid proposal, the contract itself, section 17 of article I of the Constitution of the State of New York, and section 220 of the Labor Law all refer to and contemplate subcontractors as well as contractors. The claimant was approved by the State as a subcontractor in accordance with the requirements of the bid proposal and the contract. Any obligation owed by the State either under the contract or the statute extended not only to the contractor but also to the subcontractor. In the words of Judge Cardozo in considering Glanzer v. Shepard (233 N. Y. 236): “ The bond was so close as to approach that of privity, if not completely one with it.” (Ultramares Corp. v. Touche, 255 N. Y. 170, 182-183.)
Section 17 of article I of the Constitution of the State of New York requires that laborers, workmen and mechanics employed by a contractor or subcontractor engaged in the performance of any public work shall be paid not less than the rate of wages prevailing in the same trade or occupation in the locality where the work is situated. Section 220 of the Labor Law reiterates this requirement and establishes in considerable detail the methods for accomplishment, enforcement and the rights and obligations of the State, contractors and employees. Application of that section to this project required that in advance of the letting of the contract, the Department of Public Works ascertain from the plans and specification the classifications of workmen, mechanics and laborers to be employed on the project. Here the Department of Public Works obtained considerable *810 information as to classification from the plaintiff and this information was furnished in good faith and without negligence and was based upon claimant’s many years of experience in this type of work.
The Department of Public Works was then required to file those classifications with the Industrial Commissioner “ together with a statement of the work to he performed by each such classification. ’' From such statement it was the duty of the Industrial Commissioner ‘ ‘ to make a proper classification * * * and to make a determination of the schedule of wages to be paid therefor.” (Labor Law, § 220, subd. 3-a.) This then became the schedule which was attached to the bid proposal and established the minimum rates to be paid on this project and also provided the specific classifications to be utilized. Under the contract terms but without reference to the statute, utilization of any other classifications required the consent of the Superintendent of Public Works who was required to establish the rate to be paid to any such additional classifications after advising with the Department of Labor.
There is one constant throughout this dispute. That constant was the work to be performed which was the installation of tunnel liner plate. While the constitutional provision refers to trades and occupations, section 220 of the Labor Law refers to both trades and occupations and classifications. Classification is simply another way of stating trades and occupations, for the determining factor in establishing* a prevailing wage in any particular locality is the actual work to be performed. Here the claimant had a right to rely on the bid proposal which established the minimum wage to Toe paid for this particular work as that prevailing* for the trade or occupation known as “ Laborer ”.
It is implicit in the final determination of the Industrial Commissioner on December 2, 1955, which sets forth five different trades or occupations for this work, that the original determination by the Industrial Commissioner which was a part of the contract was erroneous. The Industrial Commissioner finally determined that for some reason, the statutory obligation “ to make a proper classification” in establishing the original wage schedule attached to the bid proposal was not properly fulfilled. If this were a case where the prevailing wage originally set as part of the contract or something in excess thereof was being paid for the designated classifications and then, pursuant to the procedure established in section 220, the original classifications and prevailing wage rates were found to be erroneous and superseded at additional cost to the con *811 tractor, the case would be similar to Building Chems. Corp. v. State of New York (164 Misc. 407). Here however, there are substantially different circumstances.
The bid proposal contained a provision that classifications other than those designated in the schedule attached to the bid proposal could be used only with the consent of the Department of Public Works and in such circumstances the rate to be paid would be given by the Superintendent of Public Works with the advice of the State Department of Labor. This is a contractual provision which is not contained in or contemplated by section 220 of the Labor Law. There is no provision that any additional classifications must be used and there is no provision for the setting of proper wage rates by the Industrial Commissioner as is required by section 220 of the Labor Law. It is apparent then that this clause is contained in the contract to give an element of flexibility. The circumstances giving rise to the utilization of this flexibility are not delineated in the contract but obviously could arise where it is found in the exigencies of the work that additional classifications are required and it also might arise where a labor dispute results in a decision by the contractor to employ other classifications at a higher rate than those designated in the bid proposal and contract.
Utilization of this clause does not make applicable the penalties provided in section 220 of the Labor Law and violation of the consent provided for would not give rise to application of those penalties or to any cause of action by employees of the contractor. Those penalties can only come into play where the original schedule or revisions of the original schedule made in accordance with the administrative procedure are violated in terms of payments at less than the minimum wage. The actions therefore of the Department of Public Works in transmitting to the claimant wage rates for additional classifications on October 20 and October 27, 1952 were in accordance with the contract and simply gave the claimant an opportunity to complete the work in the face of an existing labor dispute. This the claimant did. Claimant was not put to any additional expense by any breach of duty by the State. There is no showing that even had the rates as finally determined been established as a part of the bid proposal the work could have been completed by payment of mechanics, workmen and laborers at those rates. The record indicates quite clearly that the work could not have been completed at those rates.
The provisions of section 220 while furnishing a basis for reliance by a contractor or subcontractor as to what the mini *812 mum wage will be, furnishes no guarantee against payments in excess of that rate voluntarily or by reason of the presence of labor disputes. These are risks which any contractor must assume and the contract in providing for the utilization of additional classifications at rates determined by the Superintendent of Public Works with the advice of the Department of Labor simply provides the necessary flexibility to permit the continuation of the work without converting the established minimum wages into a maximum wage.
Upon this record the claimant has failed to establish any loss resulting from any breach of statutory or contractual obligation by the State. The claim therefore must be and hereby is dismissed upon the merits.
Let judgment be entered accordingly.